**GRAND JURY PROCEEDINGS**
**UNDER SEAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

98ms 97

|  |  |
|---|---|
| IN RE:  GRAND JURY PROCEEDINGS. | ) |
|  | ) |
|  | ) |

Misc. Nos. 98-095, 98-096, and
98-097 (UNDER SEAL)

FILED

MAR 17 1998

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

**MEMORANDUM OF THE WHITE HOUSE IN OPPOSITION TO OIC'S MOTIONS
TO COMPEL BRUCE R. LINDSEY AND SIDNEY BLUMENTHAL TO TESTIFY
CONCERNING CONVERSATIONS PROTECTED BY THE ATTORNEY-CLIENT,
PRESIDENTIAL COMMUNICATIONS, AND WORK PRODUCT PRIVILEGES**

Of Counsel:
Charles F.C. Ruff
Counsel to the President
THE WHITE HOUSE
Washington, D.C.  20500
(202) 456-1414

W. Neil Eggleston
Timothy K. Armstrong
HOWREY & SIMON
1299 Pennsylvania Ave., N.W.
Washington, D.C.  20004
(202) 783-0800

Attorneys for The White House

Dated:  March 17, 1998

3

## TABLE OF CONTENTS

Page(s)

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 5

    1.    Factual Background ............................................................................. 5

    2.    Prior Proceedings Regarding Mr. Lindsey, Mr. Blumenthal, and Ms. Hernreich ..................................................................................... 6

ARGUMENT ..................................................................................................... 9

I.    THE TESTIMONY THE OIC SEEKS TO COMPEL IS PROTECTED BY THE WHITE HOUSE'S ATTORNEY-CLIENT PRIVILEGE ................. 10

    A.    The Eighth Circuit's Deeply Flawed Decision Offers No Persuasive Reason to Depart from the Authorities Recognizing the Governmental Attorney-Client Privilege ................................. 10

        1.    The Governmental Privilege in General ................................. 10

        2.    Flaws in the Eighth Circuit's Decision ................................. 12

            a.    This Circuit has Long Recognized the Attorney-Client Privilege in the Governmental Context .......................... 13

            b.    Congress Did Not Abrogate the Governmental Attorney-Client Privilege in 28 U.S.C. § 535(b) .................. 16

    B.    The Communications at Issue Here are Privileged ......................... 19

        1.    Bruce R. Lindsey ................................................................ 19

        2.    Nancy Hernreich .................................................................. 20

    C.    This Court Should Deny the OIC's Motion Even if the Attorney-Client Privilege is Qualified, Rather than Absolute, in the Governmental Context ......................................................... 20

    D.    Conversations Among Attorneys for the White House and Private Counsel for the President are Privileged from Disclosure Under the Common Interest Rule ......................................................... 21

E.     Certain of the Materials Sought are Protected from Disclosure Because they Constitute Attorney Work Product ................................... 22

II.    THE OIC SEEKS TO COMPEL COMMUNICATIONS PROTECTED UNDER THE PRESIDENTIAL COMMUNICATIONS PRIVILEGE ......................... 23

    A.     Legal Framework for Evaluating a Claim of Privilege for Presidential Communications ................................................................. 23

          1.     The Presumption of Privilege .............................................. 24

          2.     Communications to Which the Privilege Applies ..................... 26

          3.     The Showing Required to Overcome the Presumption ............................. 27

    B.     The Conversations at Issue Here are Privileged ................................. 29

          1.     The Communications at Issue Involved Official Presidential Decisions ..................................................... 30

               a.     Discussions Relating to the President's State of the Union Address ................................................. 31

               b.     Matters of Foreign Policy and Military Affairs .............................. 32

               c.     Discussions of Possible Referral by the OIC to the House Judiciary Committee ........................................... 33

               d.     Allocation of the President's Time Between Public Responsibilities and Defending Himself in the *Jones* Litigation and the Lewinsky Matter .................................... 34

               e.     Ongoing Strategy Discussions Relating to the OIC's Investigation ................................................. 36

               f.     Discussions as to Whether to Assert the Presidential Communications Privilege ........................................... 37

          2.     The OIC's Argument Misconstrues the Relevant Authorities ................................................................. 37

    C.     The OIC Has Made No Showing, Least of All the Extraordinary Showing Required, to Overcome the Privilege .................................... 40

CONCLUSION ........................................................................................ 41

# TABLE OF AUTHORITIES†

**Page(s)**

## CASES

*Bartholdi Cable Co. v. FCC*, 114 F.3d 274 (D.C. Cir. 1997) ........................................................ 24

*Branzburg v. Hayes*, 408 U.S. 665 (1972) ........................................................................ 11

*Brinton v. Dep't of State*, 636 F.2d 600 (D.C. Cir. 1980) ........................................ 13

*Citibank, N.A. v. Andros*, 666 F.2d 1192 (8th Cir. 1981) ........................................ 16

*Clinton v. Jones*, 117 S. Ct. 1636 (1997) ........................................................... *passim*

*Coastal Corp. v. Duncan*, 86 F.R.D. 514 (D. Del. 1980) ........................................ 14

*FTC v. Grolier, Inc.*, 462 U.S. 19 (1983) ........................................................... 22

*Grand Jury Subpoena Duces Tecum, In re*, 112 F.3d 910 (8th Cir.), *cert. denied*,
117 S. Ct. 2482 (1997) .................................................. 10, 13, 17, 18

*Grand Jury Subpoena, In re*, 886 F.2d 135 (6th Cir. 1989) ........................................ 11

*Green v. IRS*, 556 F. Supp. 79 (N.D. Ind. 1982), *aff'd mem.*, 734 F.2d 18 (7th Cir.
1984) .................................................................. 14

*Hearn v. Rhay*, 68 F.R.D. 574 (E.D. Wash. 1975) ........................................ 14

*Hickman v. Taylor*, 329 U.S. 495 (1947) ........................................................... 22

*Isbrandtsen Co. v. Johnson*, 343 U.S. 779 (1952) ........................................ 17

*Jaffee v. Redmond*, 116 S. Ct. 1923 (1996) ................................................ 11, 15, 16

*Jupiter Painting Contracting Co. v. United States,* 87 F.R.D. 593 (E.D. Pa. 1980) ..................... 14

*Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. RTC*, 5 F.3d 1508
(D.C. Cir. 1993) ........................................................... 16

*Mead Data Central v. United States Dep't of the Air Force*, 566 F.2d 242
(D.C. Cir. 1977) ........................................................ 11, 13, 15

*Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990) ........................................ 17

---

†     Authorities on which we chiefly rely are marked with asterisks.

*Murphy v. TVA*, 571 F. Supp. 502 (D.D.C. 1983) .................................................................. 12

*Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973) .................................................................. 24

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975) .......................................................... 15, 22

*Rosen v. NLRB*, 735 F.2d 564 (D.C. Cir. 1984) .................................................................. 11

\* *Sealed Case, In re*, 121 F.3d 729 (D.C. Cir. 1997) .......................................................... *passim*

*Sealed Case, In re*, 29 F.3d 715 (D.C. Cir. 1994) .............................................................. 22

\* *Senate Select Committee on Presidential Campaign Activities v. Nixon*,
498 F.2d 725 (D.C. Cir. 1974) ..................................................................................... *passim*

*Tax Analysts v. IRS*, 117 F.3d 607 (D.C. Cir. 1997) .......................................................... 11, 13

*United States v. AT&T*, 642 F.2d 1285 (D.C. Cir. 1980) ...................................................... 22

*United States v. Calandra*, 414 U.S. 338 (1974) ................................................................ 11

\* *United States v. Nixon*, 418 U.S. 683 (1974) .................................................................. *passim*

*Upjohn Co. v. United States*, 449 U.S. 383 (1981) ............................................................. *passim*

*Wilder v. C.I.R.*, 607 F. Supp. 1013 (M.D. Ala. 1985) ...................................................... 14

## CONSTITUTIONAL PROVISIONS

U.S. Const. Art. II, § 2 cl. 1 ......................................................................................... 32

U.S. Const. Art. II, § 3 cl. 1 ......................................................................................... 31

U.S. Const. Art. II, § 3 cl. 3 ......................................................................................... 32

U.S. Const. Art. II, § 4 ................................................................................................. 3, 34

## STATUTES

5 U.S.C. § 552(b)(5) ................................................................................................... 15, 22

28 U.S.C. § 535(b) ..................................................................................................... 16, 18

28 U.S.C. § 594(f) ..................................................................................................... 21

28 U.S.C. § 595(c) ..................................................................................................... 3

## RULES

D.C. Rule of Professional Conduct 1.6 ................................................................. 14

D.C. Rule of Professional Conduct 1.13 ............................................................... 14

Fed. R. Evid. 501................................................................................................ 16, 21

## EXECUTIVE DOCUMENTS

*Address Before a Joint Session of the Congress on the State of the Union*, 34
    WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS 129 (Jan. 27, 1998)................... 32

*Excerpt of a Telephone Interview With Morton Kondrake and Ed Henry of Roll
    Call*, 34 WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS 115 (Jan.
    21, 1998)........................................................................................................ 32, 34

*Interview With Jim Lehrer of the PBS "News Hour"*, 34 WEEKLY COMPILATION
    OF PRESIDENTIAL DOCUMENTS 104 (Jan. 21, 1998) .......................................... 32

*Interview With Mara Liasson and Robert Siegel of National Public Radio*, 34
    WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS 116 (Jan. 21, 1998)................... 32

*President's News Conference of July 6, 1955*, 1955 PUBLIC PAPERS OF THE
    PRESIDENTS 665 .................................................................................................. 25

*President's News Conference With Prime Minister Blair*, 34 WEEKLY
    COMPILATION OF PRESIDENTIAL DOCUMENTS 213 (Feb. 9, 1998)..................................... 32

*Remarks Prior to Discussions With Chairman Yasser Arafat of the Palestinian
    Authority and an Exchange With Reporters*, 34 WEEKLY COMPILATION OF
    PRESIDENTIAL DOCUMENTS 123 (Jan. 22, 1998) ................................................. 33

Scalia, Antonin, Assistant Attorney General, Office of Legal Counsel,
    *Memorandum for the Deputy Attorney General re: Disclosure of
    Confidential Information Received by U.S. Attorney in the Course of
    Representing a Federal Employee* (Nov. 30, 1976)........................................... 18

*Statement Announcing Availability of Additional Transcripts of Presidential Tape
    Recordings*, 1974 PUBLIC PAPERS OF THE PRESIDENTS 621............................... 39

Tarr, Ralph W., Acting Assistant Attorney General, Office of Legal Counsel,
    *Duty of Government Lawyers Upon Receipt of Incriminating Information
    in the Course of an Attorney-Client Relationship with Another
    Government Employee* (March 29, 1985) ......................................................... 18

## BOOKS AND TREATISES

KURLAND, PHILIP B., WATERGATE AND THE CONSTITUTION (1978)............................................. 3

MUELLER, CHRISTOPHER B., AND LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE (2d ed. 1994)................................................................................................ 14, 15

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS (Proposed Final Draft No. 1, Mar. 29, 1996)........................................................................................ 15

ROZELL, MARK J., EXECUTIVE PRIVILEGE (1994)........................................................... 24, 25

SALTZBURG, STEPHEN A., ET AL., FEDERAL RULES OF EVIDENCE MANUAL (6th ed. 1994)........................................................................................................... 16, 22

SUTHERLAND STATUTORY CONSTRUCTION (5th ed. 1992 & Cum. Supp. 1997) ......................... 17

WEINSTEIN'S FEDERAL EVIDENCE (Joseph M. McLaughlin ed., 2d ed. 1997) .............................. 21

## ARTICLES

Broder, John M., *Clinton Refuses to Discuss Independent Counsel's Request That He Testify Before Grand Jury*, N.Y. TIMES, Mar. 12, 1998, at A24.................................. 32

Clines, Francis X., and Jeff Gerth, *Subpoenas Sent as Clinton Denies Reports of an Affair With Aide at White House*, N.Y. TIMES, Jan. 22, 1998, at A1.............................. 6

Cox, Archibald, *Executive Privilege*, 122 U. PA. L. REV. 1383 (1974)......................................... 25

Gugliotta, Guy, *Impeachment Inquiry Discussed in House*, WASH. POST, Feb. 10, 1998, at A9 .......................................................................................................... 6

Mauro, Tony, and Richard Willing, *Impeachment Talk is Real*, USA TODAY, Jan. 23, 1998, at 3A ........................................................................................................ 6

Rogers, David, *Lott Says Clinton-Starr Standoff Hurts Government and Urges Both Sides to Act*, WALL ST. J., Mar. 10, 1998, at A24 .................................................... 30

Seelye, Katharine Q., *Clinton's Rapid-Response Squad Now Moves in Slow Motion*, N.Y. TIMES, Jan. 24, 1998, at A8......................................................................... 6

Staley, Alessandra, *American Puritanism or Zionist Plot? The World Weighs In*, N.Y. TIMES, Jan. 24, 1998, at A9......................................................................... 33

## OTHER AUTHORITIES

H. Res. 304, 105th Cong., 1st Sess............................................................................ 3, 34

H.R. Rep. No. 83-2622, *reprinted in* 1954 U.S.C.C.A.N. 3551 ................................... 17

Proposed Federal Rule of Evidence 503(a)(1), 56 F.R.D. 183, 235 (1972).................................. 16

Proposed Federal Rule of Evidence 503(a)(3), 56 F.R.D. 183, 236 (1972).................................. 16

Proposed Federal Rule of Evidence 503(b)(3), 56 F.R.D. 183, 236 (1972)................................. 21

Proposed Federal Rule of Evidence 503(b), 56 F.R.D. 183, 236 (1972) ....................................... 16

GRAND JURY PROCEEDINGS
UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE:  GRAND JURY PROCEEDINGS. | ) ) ) | Misc. Nos. 98-095, 98-096, and 98-097  (UNDER SEAL) |

**MEMORANDUM OF THE WHITE HOUSE IN OPPOSITION TO OIC'S MOTIONS TO COMPEL BRUCE R. LINDSEY AND SIDNEY BLUMENTHAL TO TESTIFY CONCERNING CONVERSATIONS PROTECTED BY THE ATTORNEY-CLIENT, PRESIDENTIAL COMMUNICATIONS, AND WORK PRODUCT PRIVILEGES**

The Office of the President ("White House") submits this memorandum in opposition to the Motions to Compel the testimony of Bruce R. Lindsey and Sidney Blumenthal, filed by the Office of the Independent Counsel ("OIC") on March 6, 1998 ("OIC Motions").[1]

### INTRODUCTION

The President of the United States, if he is to perform his constitutionally assigned duties, must be able to obtain the most candid, forthright, and well-informed advice from his advisors. Only last year, the United States Court of Appeals for the District of Columbia Circuit reaffirmed that principle, emphasizing the importance of preserving confidentiality of presidential communications "to ensure that presidential decisionmaking is of the highest caliber, informed by honest advice and full knowledge." *In re Sealed Case*, 121 F.3d 729, 750 (D.C. Cir. 1997).

Yet, the Independent Counsel now asks the Court to strip away this constitutional protection on the ground that, by merely completing a subpoena form and sending it to one of the

---

[1]    On March 6, 1998, the OIC also moved to compel testimony from Nancy Hernreich.  By letter of March 4, 1998, however, the White House informed OIC of its willingness to allow non-lawyers such as Ms. Hernreich to testify to factual matters.  We do not believe that, if recalled to testify before the grand jury, Ms. Hernreich would assert the privilege as to any of the factual matters about which the OIC seeks to compel her testimony.

President's lawyers or his senior advisors, he becomes entitled, without any showing of need, to invade the legal and other confidential advice on which the President must rely.  The OIC asks the Court, as well, to strip away from government lawyers and their clients the attorney-client privilege—a claim that ignores the historical roots of the privilege, the Rules of Professional Conduct that apply in the District of Columbia, and the law of this jurisdiction.

As to the presidential communications privilege, the OIC ignores the teachings of the Court of Appeals and leaps from the bald assertion that only the President's private conduct is at issue here, to the conclusion that the advice he is given should not be protected.  The OIC's contention is based on neither evidence nor logic.  With respect to the Lewinsky matter, the grand jury is inquiring into actions allegedly taken by the President while in office—indeed, actions that allegedly occurred in the White House itself.  And as to the President's deposition, the mere fact that the *Jones* case involves alleged conduct before the President took office does not mean that the advice he is given concerning his constitutional duties somehow becomes "private."  To the contrary, the Supreme Court itself acknowledged the potential impact of the *Jones* litigation on the daily business of the Presidency—an impact that, however unlikely a prospect it was a year ago, is now all too real and tangible.  Thus, even if one were to accept the OIC's description of the *Jones* case, or the President's alleged relationship with Ms. Lewinsky, as purely private, that description would be irrelevant to the question whether the communications at issue here are protected by privilege.  The critical question is not the nature of the underlying conduct; it is the purpose of the advice being given.[2]

But if there were any question about the official nature of the matters about which these witnesses have provided advice, one need only look to the ultimate purpose of the OIC's investigation.  The Ethics in Government Act requires the OIC to submit to the House of Representa-

---

[2]   For example, the conversations at issue in *United States v. Nixon*, 418 U.S. 683 (1974), involved a burglary of the DNC offices and efforts to cover it up, and yet were found to be presumptively privileged. *See infra* at 38. *See also Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 730–31 (D.C. Cir. 1974) (presidential communications relating to the Watergate coverup held presumptively privileged and not disclosed).

- 3 -

tives any evidence of impeachable offenses.[3]  *See* 28 U.S.C. § 595(c).  Impeachment is, of course, an action specifically directed at the President in his official capacity and is specifically provided for in the Constitution.  *See* U.S. CONST. Art. II, § 4.  Indeed, it is uncertain at best whether the OIC constitutionally can even ask the grand jury to take action against the President in his personal capacity.  *See, e.g.*, PHILIP B. KURLAND, WATERGATE AND THE CONSTITUTION 135 (1978) (reasoning that a sitting President could not be subjected to criminal prosecution because "[h]e is the sole indispensable man in government").   Any advice sought by the President to deal with the threat of impeachment is, by its very nature, official—not private.

Even if there were no such threat overhanging the presidency, however, the advice at issue here must be treated as official and, thus, presumptively privileged.  The distinction between those who give personal advice and those who give official advice to the President is clear.  The President's ***private*** counsel provide advice concerning the response he must make to the particular demands the OIC and the *Jones* litigation place on him in his personal capacity.  The White House Counsel and the President's senior advisors, on the other hand, provide advice concerning the official obligations of the President and the Office of the President, and are responsible for ensuring that, despite the pending litigation, he is able to perform his constitutional duties with maximum effectiveness.  It is only as to this advice—from senior advisors like Mr. Blumenthal—that the presidential communications privilege has been invoked.  Similarly, it is only as to legal advice given by Mr. Lindsey to the President in his official capacity that we have asserted the government's attorney-client privilege.

Finally, the circumstances under which the Independent Counsel has brought these Motions make clear the overly intrusive nature of his inquiry—one launched with no sensitivity to the most rudimentary constitutional principles and seemingly intended to manufacture a constitutional confrontation.  Recognizing the grand jury's legitimate interest in obtaining the evidence

---

[3]    The threat of referral for possible impeachment proceedings is not just hypothetical.  There is now pending in the House of Representatives a resolution to impeach President Clinton for an alleged "systematic effort to obstruct, undermine, and compromise the legitimate and proper functions and processes of the [E]xecutive [B]ranch[.]"  *See* H. Res. 304, 105th Cong., 1st Sess.

- 4 -

it needs, we have made clear to the OIC from the beginning our willingness to provide the facts relevant to its investigation to the fullest extent consistent with the President's constitutional obligations. But we have also made clear our firm conviction that the OIC can have no legitimate interest in the White House staff's discussions of political or legal strategy, much less in whether anyone, in or out of the White House, has spoken less than favorably about the OIC.

Consistent with this position, we informed the OIC as early as February 3, 1998, that, in shaping any limited invocation of executive privilege that might be necessary for the President's non-attorney advisors, we would, as we had in other cases, *see, e.g., Sealed Case*, 121 F.3d at 735–36, distinguish between facts and advice. (*See* Declaration of Charles F.C. Ruff ("Ruff Decl.") ¶ 32) . This position was reaffirmed in our letter to the OIC of March 4, 1998, but our offer was spurned. (*See* Ruff Decl. Exhibits ("Exs.") 6, 7). Indeed, the OIC moved to compel the testimony of Nancy Hernreich on the very same day that it rejected the White House's offer to withdraw the assertion of privilege as to her. (*See* Ruff Decl. Ex. 7). And two days before that, the OIC rejected the White House's request that, before it launched any litigation, counsel meet to determine whether there could be an accommodation of the grand jury's interests with those of the Presidency—a process specifically contemplated by the Court of Appeals as the vehicle for minimizing the risk of unnecessary constitutional conflict. *See Sealed Case*, 121 F.3d at 735 (OIC's motion to compel production of documents followed considerable negotiations with the White House).

The Independent Counsel comes before this Court seeking essentially unfettered authority to inquire into every conversation the President, his lawyers and his advisors have had about the *Jones* case and the Lewinsky matter. He does so without being willing to proffer to the court the slightest justification for that inquiry—beyond his mere wish—and in direct contravention of the Court of Appeals' mandate that any intrusion into privileged communications must be narrowly focused and specifically justified. As the following discussion will make clear, that wish is grounded neither in good law nor sensible constitutional practice.

## BACKGROUND

### 1.    Factual Background

The roots of this dispute date at least back to May 27, 1997, when the Supreme Court decided *Clinton v. Jones*, 117 S. Ct. 1636 (1997).  The Court rejected the President's attempt to stay temporarily the ongoing civil proceedings against him in a sexual harassment lawsuit brought by a former Arkansas state employee.  In holding that the President was not, despite his unique position in the constitutional structure, entitled to a temporary stay of the civil proceedings against him, the Court opined that "it seems unlikely that a deluge of such litigation will ever engulf the Presidency" and suggested that the *Jones* case, "if properly managed by the District Court, . . . appears to us highly unlikely to occupy any substantial amount of petitioner's time." *Id.* at 1648.

In the wake of *Clinton v. Jones*, the President confronted an unavoidable dilemma.  On the one hand, he remained the Nation's chief executive with a full panoply of domestic and foreign obligations which, the Court recognized, regularly required his personal attention for as much as twenty hours a day.  *See Clinton v. Jones*, 117 S. Ct. at 1646 & nn.25–26; Ruff Decl. ¶ 6.  But on the other hand, by virtue of the Court's decision, the President was obliged to attend to the *Jones* litigation ongoing in Arkansas, including formulating discovery responses, submitting to a deposition, strategizing with counsel, and evaluating and responding to potential avenues of settlement.  At its core, the Court's decision in *Clinton v. Jones* meant that the President could not choose one course or the other—doing the job to which he was elected, or defending himself against the *Jones* lawsuit.  He was, instead, required to do both. (*See* Ruff Decl. ¶¶ 4, 7; Declaration of Bruce R. Lindsey ("Lindsey Decl.") ¶ 8).  How the President reconciles these types of conflicting obligations is the focus of a major portion of the communications over which the White House now invokes the presidential communications privilege, discussed in more detail below.

On Saturday, January 17, 1998, the President gave a deposition in *Jones v. Clinton*, No. LR-C-94-290 (E.D. Ark.).  In this deposition, the President was asked certain questions

relating to Monica Lewinsky, a former White House intern.  On or about January 21, 1998, it was publicly announced that the jurisdiction of Independent Counsel Kenneth W. Starr had been expanded to include an investigation of Ms. Lewinsky and whether she or others suborned perjury or violated any other federal laws.  (*See* Ruff Decl. ¶ 10).

In light of the new allegations, particularly those involving alleged obstruction of justice, commentators publicly adverted to the prospects of impeaching the President.[4]  Those prospects took on a heightened reality when the Chairman of the House Judiciary Committee publicly stated that "impeachment might very well be an option" if the OIC substantiated its latest allegations against the President.  *See* Francis X. Clines & Jeff Gerth, *Subpoenas Sent as Clinton Denies Reports of an Affair With Aide at White House*, N.Y. TIMES, Jan. 22, 1998, at A1, A24 (quoting Rep. Henry J. Hyde (R-Ill.)); *accord* Katharine Q. Seelye, *Clinton's Rapid-Response Squad Now Moves in Slow Motion*, N.Y. TIMES, Jan. 24, 1998, at A8 ("'If indeed the President was guilty of obstruction of justice, I really would think that the word "impeachment" would be one of the words to be used.'") (quoting Rep. Charles B. Rangel (D-NY)).

### 2.   Prior Proceedings Regarding Mr. Lindsey, Mr. Blumenthal, and Ms. Hernreich

From the outset, the White House has taken expansive measures to cooperate fully with the OIC's investigation.  The White House promptly searched the entire Executive Office of the President for documents responsive to the OIC's subpoenas, and has produced all responsive materials.  (*See* Ruff Decl. ¶ 13).

On January 30, 1998, the OIC subpoenaed Bruce Lindsey, Assistant to the President and Deputy Counsel, calling for him to appear before the grand jury to testify on February 4, 1998.  (*See* Ruff Decl. ¶ 31).  Around this time, the OIC also issued subpoenas to Sidney Blumenthal, Assistant to the President, and to Nancy Hernreich, Deputy Assistant to the President and Direc-

---

[4]   *See, e.g.*, Guy Gugliotta, *Impeachment Inquiry Discussed in House*, WASH. POST, Feb. 10, 1998, at A9; Katharine Q. Seelye, *Clinton's Rapid-Response Squad Now Moves in Slow Motion*, N.Y. TIMES, Jan. 24, 1998, at A8 ("George Stephanopoulos, a main campaign aide in 1992 and Mr. Clinton's senior adviser until after the 1996 election, was among the first to use the word 'impeachment' over the allegations[.]"); Tony Mauro & Richard Willing, *Impeachment Talk is Real*, USA TODAY, Jan. 23, 1998, at 3A; Ruff Decl. ¶¶ 21–22.

tor of Oval Office Operations. All three witnesses appeared before the grand jury and offered testimony.

The White House has, at every stage, sought to narrow and focus the issues over which any assertion of privilege may properly be invoked. Although the White House has endeavored to do so in cooperation with the OIC, as is plainly contemplated by *Sealed Case*, 121 F.3d at 735–36, the OIC has generally declined to participate.

For example, Charles Ruff, Counsel to the President, and Lanny Breuer, Special Counsel, met with the OIC on February 3, 1998 to discuss potential privilege concerns that could be raised during the grand jury testimony of Mr. Lindsey and John Podesta, Deputy Chief of Staff. *(See* Ruff Decl. ¶ 32). Mr. Ruff explained the potential privilege concerns that would necessarily arise if the OIC questioned Mr. Lindsey and other advisors regarding advice given to the President in his official capacity, and asked whether the OIC could specify the subjects about which they wished to elicit testimony. The OIC declined to do so *(id.)*, and subsequently informed the White House that they would not recognize the applicability of executive privilege in this case. *(See* Ruff Decl. ¶ 34). Nevertheless, following the negotiation process contemplated by *Sealed Case*, Mr. Ruff reiterated the White House's desire to seek an accommodation of the parties' respective interests by letter of February 5, 1998. *(See* Ruff Decl. ¶¶ 35–36 & Ex. 2).

Subsequently, the White House voluntarily and unilaterally narrowed the scope of the communications over which privilege was being asserted. Yet, incredibly, in its haste to provoke a constitutional confrontation, the OIC actually *rejected* the White House's offer to withdraw the assertion of privilege as to Ms. Hernreich, one of the witnesses whose testimony the OIC has moved to compel.

By letter of March 2, 1998, counsel for the White House reiterated the White House's desire to reach an accommodation between the OIC's desire for testimony and the White House's need to ensure the availability of candid advice to future Presidents, and offered to meet with the OIC to discuss the matter. *(See* Ruff Decl. ¶ 45 & Ex. 4). The OIC responded by asking the

White House to submit its proposal by noon on March 4, 1998. (*See* Ruff Decl. ¶ 46 & Ex. 5). The White House complied.

In its proposal, the White House offered to narrow the scope of executive privilege it would assert. The White House's proposal would have relinquished the privilege and allowed non-attorney White House advisors, such as Ms. Hernreich, to testify fully to any relevant facts, including conversations with the President. (*See* Ruff Decl. ¶¶ 47–59 & Ex. 6). As the proposal stated:

> [T]he Office of the President is prepared to instruct White House witnesses along the following general lines:
>
> • <u>White House Advisors (Non-Lawyers)</u>: Advisors will be permitted to testify as to factual information regarding the Lewinsky matter, including any such information imparted in conversations with the President. We will continue to assert executive privilege with regard to strategic deliberations and communications.
>
> • <u>White House Attorney Advisors</u>: Attorneys in the Counsel's Office will assert attorney/client privilege; attorney work product; and, where appropriate, executive privilege, with regard to communications, including those with the President, related to their gathering of information, the providing of advice, and strategic deliberations and communications.

(Ruff Decl. Ex. 6, at 2). By confining the assertion of executive privilege to "strategic deliberations and communications" and communications by and among attorneys in the White House Counsel's office (*id.*), the White House believed that its proposal would lead to the accommodation *Sealed Case* contemplates.

Instead, on March 6, 1998, the OIC curtly rejected the White House's proposal outright, ***including*** the proposed withdrawal of the privilege as to all factual testimony by non-attorneys such as Ms. Hernreich. (*See* Ruff Decl. ¶ 51 & Ex. 7). The same day, the OIC filed the motions to compel that are at issue here.

Thus, although the White House has reserved the invocation of executive privilege to that inner core of conversations that cannot be disclosed without materially harming the ability of future Presidents to confer with advisors candidly, the OIC has shown itself to be much more

- 9 -

interested in provoking a needless constitutional controversy than in actually obtaining the factual evidence it claims to want.  For the reasons that follow, the OIC's Motions must be denied.

## ARGUMENT

In this consolidated reply to the OIC's Motions to Compel, we address, first, the attorney-client privilege and the attorney work product doctrine as they apply to the testimony of Bruce Lindsey, Deputy Counsel to the President, and second, the presidential communications privilege as it applies to Sidney Blumenthal, Assistant to the President, and other non-attorney advisors, as well as to Mr. Lindsey.

The OIC seeks to compel Mr. Lindsey to divulge a range of communications presumptively protected by the attorney-client privilege: discussions with the President and senior White House staff for the purpose of affording legal advice; discussions with the President's personal counsel on matters encompassing his private and official interests;[5] and discussions with counsel for other individuals with whom the White House had a common interest.  The absolute privilege protecting communications between an attorney and his client has been recognized since the birth of the common law and is firmly imbedded in the law of the District of Columbia—in both its private and governmental forms.  The contrary view of the Court of Appeals for the Eighth Circuit in *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910 (8th Cir.), *cert. denied*, 117 S. Ct. 2482 (1997) ("*Grand Jury Subpoena*"), on which the OIC rests its entire argument, does not control here and, in any event, is deeply flawed.  But even if the special circumstances present here suggest the need to balance the values inherent in the privilege against the needs of the grand jury, the OIC has offered absolutely nothing to weigh in that balance.

The OIC proffers only one argument in its attempt to pierce the executive privilege that has protected presidential communications since the dawn of the Republic—an argument that finds no support in the case law.  The OIC would have the Court find, based solely on its unsup-

---

[5]   Private counsel for the President will raise as well his personal attorney-client privilege to protect discussions with Mr. Lindsey on the occasions in which he served as a conduit for communications between them and their client.

ported claim that the testimony it seeks relates to "private" conduct, that the privilege simply does not apply. Moreover, it asks the Court to bypass the careful analysis of individual communications mandated by the Court of Appeals in *Sealed Case* and require wholesale disclosure of all discussions with the President and his senior advisors. This argument flies in the face of the presumptive privilege that attaches to presidential communications—a presumption that the courts have made clear can be overcome only on the most stringent showing of need on a communication-by-communication basis.

For these reasons, this Court should deny the OIC's motions to compel.

## I.   THE TESTIMONY THE OIC SEEKS TO COMPEL IS PROTECTED BY THE WHITE HOUSE'S ATTORNEY-CLIENT PRIVILEGE

The attorney-client privilege protecting communications between a government agency and its attorneys is an established principle under the law of this Circuit. The Court of Appeals for the Eighth Circuit's contrary opinion, on which the OIC hangs the entire weight of its argument, stands alone in holding the privilege inapplicable when invoked in grand jury proceedings. *See In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 913 (8th Cir.), *cert. denied*, 117 S. Ct. 2482 (1997) ("*Grand Jury Subpoena*"). The Eighth Circuit's decision demonstrably conflicts with precedent binding in this Circuit, and it should not be followed here.

### A.   The Eighth Circuit's Deeply Flawed Decision Offers No Persuasive Reason to Depart from the Authorities Recognizing the Governmental Attorney-Client Privilege

#### 1.   The Governmental Privilege in General

It is hornbook law that organizations have an attorney-client privilege against compelled disclosure of conversations between the organization's counsel and the organization's officials and employees. *See, e.g., Upjohn Co. v. United States*, 449 U.S. 383 (1981). Although *Upjohn* arose in the context of the corporate attorney-client privilege, nothing in the Court's assessment of a organization's need for freedom to consult with attorneys in confidence was limited to the corporate context. Accepting the logical implications of *Upjohn*, courts in this Circuit routinely

have recognized that the attorney-client privilege protects governmental organizations as well as private ones. *See Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997); *Mead Data Central v. United States Dep't of the Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977). Evidentiary privileges such as the attorney-client privilege remain fully applicable in grand jury proceedings. *See Sealed Case*, 121 F.3d at 756 (citing *Branzburg v. Hayes*, 408 U.S. 665, 688 (1972) (recognizing applicability in grand jury proceedings of "the longstanding principle that 'the public . . . has a right to every man's evidence,' *except for those persons protected by a constitutional, common-law, or statutory privilege[.]*") (emphasis added, citations omitted);[6] *United States v. Calandra*, 414 U.S. 338, 346 (1974) (grand jury "may not itself violate a valid privilege, whether established by the Constitution, statutes, or the common law.") (citations omitted)). The applicability of the governmental attorney-client privilege has been specifically confirmed in federal grand jury proceedings. *See In re Grand Jury Subpoena*, 886 F.2d 135 (6th Cir. 1989).

The Supreme Court has recognized that the attorney-client privilege advances important public interests. By "encourag[ing] full and frank communications between attorneys and their clients," the privilege enables clients "to make full disclosure to their attorneys" without fear that the discussions will become public, and thereby "promote[s the] public interests in the observance of law and administration of justice." *Upjohn*, 449 U.S. at 389 (internal quotations and citations omitted). This purpose cannot be served unless the client is "free from the consequences or the apprehension of disclosure." *Id.* (internal quotations and citations omitted); *see also Jaffee v. Redmond*, 116 S. Ct. 1923, 1928 (1996) ("the mere possibility of disclosure" of protected communications "may impede development of the confidential relationship" the privi-

---

[6]   The Court of Appeals for this Circuit has, similarly, recognized that the attorney-client privilege must be accorded its full sweep even in the face of the argument that it deprives the public of "every man's evidence":

> The attorney-client privilege is but one of several privileges that prevent parties themselves from adducing particular evidence, and thus create an obstacle to fact finding due to the broad judgment that the value of introducing such evidence is outweighed by the harm inflicted upon other policies and values. . . . [S]uch [evidentiary] burdens are simply a necessary consequence of society's attempt to balance the value of the complete admissibility of probative evidence with other competing values, such as the protection of vital professional or associational relationships.

*Rosen v. NLRB*, 735 F.2d 564, 572 (D.C. Cir. 1984) (Starr, J.).

lege exists to protect). These purposes apply with no less force in the present case and compel a very critical evaluation of the OIC's attempt to pierce the privilege.

In the governmental context, the attorney-client privilege advances other public interests as well. "[B]y safeguarding the free flow of information" within the government agency, the privilege fosters fairer and more accurate government decisionmaking. *Murphy v. TVA*, 571 F. Supp. 502, 506 (D.D.C. 1983); *see also Grand Jury Subpoena*, 112 F.3d at 929–32 (Kopf, J., dissenting).

An additional nuance arises here because the client whose confidences are at issue is the President. In this context, the presidential communications and attorney-client privileges are mutually self-reinforcing. Both exist to guarantee that the President receives necessary advice and input with the candor that can be secured only when advisors are free from apprehension about how third parties or the public may view them. When government attorneys or other advisors doubt the confidentiality of their communications, they will of necessity speak guardedly, hedging their recommendations with a view toward preserving the natural human desire to be well thought of by others. Such caution extracts a heavy toll, for it prevents the President from receiving the candid assistance necessary to run the government effectively and thereby serve the national interest. Here, that interest is protected by not just one, but two privileges, one of Constitutional dimension and the other with common-law roots deeper than any other privilege. In this circumstance, fidelity to both these reinforcing lines of authority compels the most intensive and exacting scrutiny of the OIC's attempt to pierce these privileges.

### 2.    Flaws in the Eighth Circuit's Decision

In reaching the contrary result on which the OIC relies, the Eighth Circuit's decision—which is not binding on this Court—committed numerous analytical errors and misread the relevant authorities.

- 13 -

### a. This Circuit has Long Recognized the Attorney-Client Privilege in the Governmental Context

To begin with, the Eighth Circuit incorrectly framed the issue before it. The court acted as if it was being asked to recognize a new privilege, and thus as if it must overcome a presumption against protecting the documents that had been subpoenaed. *See Grand Jury Subpoena*, 112 F.3d at 915. But the case before that court, like the instant case, presented no such issue at all. Far from being asked to create a privilege that was in any sense "new," the court was simply called upon to apply the single best settled and oldest of all the privileges known to the common law, *Upjohn*, 449 U.S. at 389, to the facts before it. There was no occasion for the application of the presumption against the creation of a new privilege, and the court erred in acting as if there was.

Second, the Eighth Circuit treated as a matter of first impression whether a governmental attorney-client privilege existed at all. *See Grand Jury Subpoena*, 112 F.3d at 915 ("We need not decide whether a governmental attorney-client privilege exists in other contexts, for it is enough to conclude that even if it does," it is inapplicable). Even assuming *arguendo* that the court's characterization of the question as an open issue in the Eighth Circuit was correct, it would not be relevant here. The governmental attorney-client privilege is a long-established fixture under the law in this Circuit and is in no sense an open question. *See, e.g.*, *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997) ("In the governmental context, the 'client' may be the agency and the attorney may be an agency lawyer," although the Court ultimately finds the privilege inapplicable); *Brinton v. Dep't of State*, 636 F.2d 600, 603 (D.C. Cir. 1980) (recognizing governmental attorney-client privilege, although resting decision on deliberative process grounds instead); *Mead Data Central v. United States Dep't of the Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977) ("In order to ensure that a client receives the best possible legal advice, based on a full and frank discussion with his attorney, the attorney-client privilege assures him that confidential communications to his attorney will not be disclosed without his consent. We see no reason why this same protection should not be extended to an agency's communica-

- 14 -

tions with its attorneys under [FOIA] exemption five."). Thus, a central analytical basis for the Eighth Circuit's decision is not only absent here, but indeed contradicted by settled precedent binding on this Court.[7] The D.C. Bar's professional rules also expressly recognize the applicability of the attorney-client privilege in the governmental context. *See* District of Columbia Rules of Professional Conduct, R. 1.13 & cmt. 7 (the government lawyer "represents the agency acting through its duly authorized constituents."), 1.6 & cmts. 33–36 (recognizing ethical duty of government lawyers to preserve the client agency's confidences).

Third, the Eighth Circuit incorrectly assumed, without authority, that the application of the attorney-client privilege turns on the specific circumstances at the time it is raised. Because it found no previous decision applying the privilege in an identical factual context, the Eighth Circuit assumed it was writing on a blank slate. This freed the court, in its view, to engage in a *de novo* assessment of the interests served by, and putative evidentiary costs of, the attorney-client privilege. But this mode of analysis is utterly foreign to the attorney-client privilege. A hallmark of absolute privileges such as the attorney-client privilege—as distinct from qualified privileges such as the protection for attorney work product[8]—is that they do not turn on *post hoc*

---

7    Other courts agree with this one. *See, e.g., Wilder v. C.I.R.*, 607 F. Supp. 1013, 1015 (M.D. Ala. 1985) (it is "well settled" that documents prepared by agency counsel "fall within the ambit of the attorney-client privilege"); *Green v. IRS*, 556 F. Supp. 79, 85 (N.D. Ind. 1982) (attorney-client privilege "unquestionably is applicable to the relationship between Government attorneys and administrative personnel"), *aff'd mem.*, 734 F.2d 18 (7th Cir. 1984); *Jupiter Painting Contracting Co. v. United States*, 87 F.R.D. 593, 598 (E.D. Pa. 1980) (explaining that "[c]ourts generally have accepted that attorney-client privilege applies in the governmental context," so despite "apprehension at [the privilege's] pernicious potential in a government top-heavy with lawyers . . . [t]his concern does not justify application of a different privilege to governmental attorney-client relationships."). *Coastal Corp. v. Duncan*, 86 F.R.D. 514, 520 (D. Del. 1980) ("the attorney-client privilege is applicable in the factual context where a government agency is a 'client' and agency lawyers are 'attorneys.'"). *Hearn v. Rhay*, 68 F.R.D. 574, 579 (E.D. Wash. 1975) ( "[f]ederal courts have uniformly held that the attorney-client privilege can arise with respect to attorneys representing a state").

8    As one treatise on evidence put it:

> In other respects, however, the attorney-client privilege provides more protection than the work product doctrine. While the privilege is absolute, the work product doctrine provides only a qualified immunity which in the case of ordinary work product can be overcome by a showing of "substantial need" and "undue hardship" in obtaining the "substantial equivalent of the materials by other means." . . . The work product doctrine operates primarily as a limitation on pretrial discovery, whereas the attorney-client privilege applies more broadly at all stages of legal proceedings.

2 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 204 (2d ed. 1994).

- 15 -

demonstrations of need or balancing of interests at the time the privilege is asserted. A contrary rule effectively vitiates the entire purpose of absolute privileges such as the attorney-client privilege, which is intended to encourage communications that might not be made in its absence. *See Upjohn*, 449 U.S. at 395; *Jaffee*, 116 S. Ct. at 1929 ("[w]ithout a privilege, much of the desirable evidence to which litigants . . . seek access . . . is unlikely to come into being"). Allowing the attorney-client privilege to turn on a *post hoc* assessment of the particular circumstances in which it is asserted in litigation prevents the privilege from serving its key function: providing clients assurance in advance that they may speak freely without fear of disclosure.

Other authorities confirm the Eighth Circuit's error in rejecting the applicability of the governmental attorney-client privilege. For one, the privilege has received express legislative recognition by Congress under Exemption 5 of the Freedom of Information Act (FOIA), 5 U.S.C. § 552(b)(5). This exemption allows governmental agencies to withhold from disclosure, in response to a FOIA request, any "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency[.]" *Id.* Congress's clear intent to enact a federal law of governmental attorney-client privilege (and protection for attorney work product) was noted by the Supreme Court in *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 154 (1975) ("[t]he Senate Report states that Exemption 5 'would include the working papers of the agency attorney and documents which would come within the attorney-client privilege if applied to private parties' "). *See also Mead Data Central*, 566 F.2d at 252; *Grand Jury Subpoena*, 112 F.3d at 930 (Kopf, J., dissenting).

The overwhelming weight of scholarly authority recognizes the existence and importance of the privilege in the governmental context. *See, e.g.*, RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 124 (Proposed Final Draft No. 1, Mar. 29, 1996) ("the generally prevailing rule . . . [is that] governmental agencies and agents enjoy the same privilege as non-governmental counterparts."); 2 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 191 (2d ed. 1994); *see also Grand Jury Subpoena*, 112 F.3d at 930 (Kopf, J., dissenting).

What is more, the Supreme Court's Proposed Federal Rules of Evidence, which have repeatedly been relied on in this Circuit and by the Supreme Court as accurate statements of the common law of privilege,[9] expressly recognized the applicability of the attorney-client privilege in the governmental context. Proposed Rule 503, dealing with the attorney-client privilege, defined "client" to include a "public officer, . . . or other organization or entity, either public or private[.]" Proposed Federal Rules of Evidence, Rule 503(a)(1), 56 F.R.D. 183, 235 (1972). The accompanying Advisory Committee's Note emphasized that "[t]he definition of 'client' includes governmental bodies." *Id.* R. 503(a)(1) adv. comm. note, 56 F.R.D. at 237. *See generally Grand Jury Subpoena*, 112 F.3d at 926, 928–29 (Kopf, J., dissenting).

### b.    Congress Did Not Abrogate the Governmental Attorney-Client Privilege in 28 U.S.C. § 535(b)

In reaching its decision, the Eighth Circuit incorrectly relied on a relatively obscure provision of law requiring executive branch employees to report to the Attorney General information relating to criminal acts committed by their colleagues. Citing 28 U.S.C. § 535(b),[10] the

---

9    Although Congress ultimately enacted Fed. R. Evid. 501, which calls upon the federal courts to develop a federal common law of privilege, instead of enacting the specific privileges in the form proposed by the Supreme Court, the Court's Proposed Rules on the subject of privilege have been widely recognized as accurate statements of the common law and are entitled to appropriate consideration. *See, e.g., Jaffee v. Redmond*, 116 S. Ct. 1923, 1927 n.7, 1928, 1930–31 (relying on statement of psychotherapist-patient privilege in Proposed Rules); *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. RTC*, 5 F.3d 1508, 1514 (D.C. Cir. 1993) (relying, *inter alia*, on Proposed Rules 503(a)(3) and 503(b) to describe the contours of the attorney-client privilege); *Citibank, N.A. v. Andros*, 666 F.2d 1192, 1195 n.6 (8th Cir. 1981) ("courts have continued to look to the proposed rules as a source for defining the federal common law of attorney-client privilege."). "Most importantly, the proposed rule covering the attorney-client privilege is still at this point a generally reliable statement of federal common law." 2 STEPHEN A. SALTZBURG ET AL., FEDERAL RULES OF EVIDENCE MANUAL 589 (6th ed. 1994); *see also Grand Jury Subpoena*, 112 F.3d at 928–29 (Kopf, J., dissenting).

10    This statute provides that:

> Any information, allegation, or complaint received in a department or agency of the executive branch of the Government relating to violations of title 18 involving Government officers and employees shall be expeditiously reported to the Attorney General by the head of the department or agency, unless—
>
> > (1) the responsibility to perform an investigation with respect thereto is specifically assigned otherwise by another provision of law; or
> >
> > (2) as to any department or agency of the Government, the Attorney General directs otherwise with respect to a specified class of information, allegation, or complaint.

28 U.S.C. § 535(b).

majority found it "significant" that government employees, "including attorneys, are under a statutory duty to report criminal wrongdoing by other employees to the Attorney General." *Grand Jury Subpoena*, 112 F.3d at 920. Neither the plain language of section 535(b) nor its legislative history, however, evinces any intent to vitiate the attorney-client privilege. The text of the provision does not mention the attorney-client privilege and does not, by its terms, command the interpretation the Eighth Circuit adopted. Similarly, there is no evidence of Congressional intent to abrogate the most firmly entrenched common law privilege protecting communications between attorneys and their clients. As the House Report on this provision makes clear, the objective of section 535(b) was simply to settle a jurisdictional battle between investigative agencies:

> The purpose of the proposed legislation is to set out the necessary authority for the Attorney General and the Federal Bureau of Investigation to investigate alleged irregularities on the part of Government officers and employees and to require the reporting by the departments and agencies of the executive branch to the Attorney General of information coming to their attention concerning any alleged irregularities on the part of officers and employees of the Government.

H.R. Rep. No. 83-2622, *reprinted in* 1954 U.S.C.C.A.N. 3551.

The absence of case law interpreting this statute's applicability to government attorneys only enhances the need for clarity in assessing legislative intent. A fundamental axiom of statutory construction is that, where the text of a law is ambiguous, one should not presume a legislative intention to abrogate settled common-law principles. 2B SUTHERLAND STATUTORY CONSTRUCTION § 50.01 (5th ed. 1992 & Cum. Supp. 1997). As the Supreme Court has instructed, "[s]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952). Congress acts within the framework of existing law, not within a vacuum. *See, e.g., Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation."). Therefore, in the absence of "an indication that the legislature intends a

statute to supplant common law, the courts should not give it that effect." SUTHERLAND STATU-

TORY CONSTRUCTION, *supra.*

Fidelity to these settled principles compels the conclusion that section 535(b) should not

be read to undermine the well-established attorney-client privilege. As Judge Kopf's dissenting

opinion in the Eighth Circuit noted, the Department of Justice, which section 535(b) charges to

enforce the reporting provision, has always interpreted this provision to be consistent with the

long-standing protection for confidential attorney-client communications. *See Grand Jury Sub-*

*poena*, 112 F.3d at 932 (Kopf, J., dissenting). On several occasions, the Justice Department's

Office of Legal Counsel has expressed the opinion that the attorney-client privilege survives

section 535(b). *Id.* According to then-Assistant Attorney General Antonin Scalia, "[g]iven the

absence of any discussion of the subject in the legislative history [of § 535(b)], it would in our

view be inappropriate to infer a congressional purpose to breach the universally recognized and

long-standing confidentiality of the attorney-client privilege." Antonin Scalia, Assistant Attor-

ney General, Office of Legal Counsel, *Memorandum for the Deputy Attorney General re: Dis-*

*closure of Confidential Information Received by U.S. Attorney in the Course of Representing a*

*Federal Employee* at 7 (Nov. 30, 1976). Nearly a decade later, the Office of Legal Counsel

reconfirmed this interpretation, stating that "the principal reason for our conclusion that the

attorney-client privilege overrides § 535(b) is that the confidentiality of communications be-

tween client and lawyer is essential if Department attorneys are to be able to provide adequate

legal representation." Ralph W. Tarr, Acting Assistant Attorney General, Office of Legal Coun-

sel, *Duty of Government Lawyers Upon Receipt of Incriminating Information in the Course of an*

*Attorney-Client Relationship with Another Government Employee* at 6 (March 29, 1985). The

uniformity of the Office of Legal Counsel's position, which represents the only precedential

authority on the specific application of section 535(b) to this situation, only strengthens the

conclusion already reached by applying prevailing principles of statutory construction: this stat-

ute clearly does not contravene the attorney-client privilege. *See generally Grand Jury Sub-*

*poena*, 112 F.3d at 930–32 (Kopf, J., dissenting).

Because the Eighth Circuit's decision is inconsistent with precedent binding in this Circuit, and out of step with the long-standing consensus of other authorities, this Court should not follow it.

## B.   The Communications at Issue Here are Privileged

### 1.   Bruce R. Lindsey

Mr. Lindsey's conversations involved the President's attorney-client privilege in both his official and unofficial capacities. First, as Deputy White House Counsel, Mr. Lindsey represents the Office of the President and, in that capacity, has had confidential conversations with the client or the client's representatives relating to the provision of legal advice. (*See* Lindsey Decl. ¶¶ 9–12). These conversations are directly covered by the White House's attorney-client privilege. Some of Mr. Lindsey's conversations related to providing legal advice on the questions whether the Office of the President should invoke its testimonial privileges, including the attorney-client and presidential communications privileges. (*See* Lindsey Decl. ¶ 11). The OIC also seeks to compel conversations Mr. Lindsey had relating to possible impeachment proceedings before the House Judiciary Committee. (*Id.*). These discussions, which related directly to Mr. Lindsey's gathering of information to provide legal advice to his client, are plainly covered by the White House's attorney-client privilege. (*Id.*; *see also* Ruff Decl. ¶ 22). Mr. Lindsey also had discussions with witnesses who testified before the grand jury, or their counsel, during the course of gathering information to use in advising the White House on matters of litigation strategy. (*See* Lindsey Decl. ¶ 13). These interviews are also protected by the attorney-client privilege.

Second, Mr. Lindsey has stated in his Declaration that he has occasionally communicated with the President's private counsel while acting on behalf of the President in the President's individual capacity. (*See* Lindsey Decl. ¶ 12). To the extent this latter situation raises issues primarily within the President's individual attorney-client privilege, the White House will not address it in detail herein.

### 2.    Nancy Hernreich

As suggested in the White House's proposal to the OIC of March 4, 1998, the White House withdraws the assertion of privilege as to factual questions submitted to Ms. Hernreich, including factual questions regarding communications with the President.

### C.    This Court Should Deny the OIC's Motion Even if the Attorney-Client Privilege is Qualified, Rather than Absolute, in the Governmental Context

Even assuming the Eighth Circuit majority was correct and a qualified attorney-client privilege, subject to a balancing of interests after the fact, is appropriate in the governmental context, that fact alone would not justify the majority's conclusion that the privilege automatically evaporated in the face of a grand jury subpoena from the OIC. Rather, qualified privileges generally require the party opposing the privilege to make some showing of *need* to surmount the privilege's protection. *See, e.g.*, *Sealed Case*, 121 F.3d at 745–46, 753–57 (discussing showing of need required to overcome qualified presidential communications privilege). By requiring no demonstration at all by the OIC before ruling the privilege unavailable, the Eighth Circuit again made new law that is at odds with settled precedent in this Circuit.

To say that the OIC must make some showing to overcome the attorney-client privilege necessarily raises the question of what that showing should be. We submit that, at least, the same "focused demonstration of need," showing that the evidence is "demonstrably critical to the responsible fulfillment" of the OIC's role, see *infra* at 27, must be required.

This was substantially the position taken by the Department of Justice, speaking through the Solicitor General as *amicus curiae* in support of the petition for certiorari filed by the White House, seeking review of the Eighth Circuit's decision. *See Office of the President v. Office of Independent Counsel*, (U.S., No. 96-1783), Brief *Amicus Curiae* For the United States, Acting

Through the Attorney General, Supporting Certiorari ("DOJ Brief").[11] Evaluating the attorney-client privilege in the unique context of an intra-branch dispute between the White House and the OIC, the Justice Department suggested that

> the district court should, in ruling on the motion to compel, accommodate the competing interests at stake in a manner similar to the accommodation that takes place in an ordinary, non-independent-counsel context.

DOJ Brief at 14 (footnote omitted).  DOJ argued that a "useful analogy . . . [could] be drawn to the resolution of assertions of executive privilege," *id.* at 15, and suggested that the test established in *Nixon* and its progeny would best accommodate the competing interests at stake.  *See generally id.* at 11–16.

> ### D.   Conversations Among Attorneys for the White House and Private Counsel for the President are Privileged from Disclosure Under the Common Interest Rule

The OIC contends that the governmental attorney-client privilege, even if it exists, could not attach to conversations with the President's private counsel.  Again, the OIC is wrong.  Every conversation in which private counsel participated is protected from disclosure under the common interest rule.

The Supreme Court's Proposed Rule 503(b)(3) recognized that "[t]he lawyer-client privilege applies to communications made by the client 'or his lawyer to a lawyer representing another in a matter of common interest.' " 3 WEINSTEIN'S FEDERAL EVIDENCE § 503.13[2] (Joseph M. McLaughlin ed., 2d ed. 1997) (quoting Proposed Rule 503(b)(3), 56 F.R.D. 183, 236 (1972)).[12] The common interest rule recognizes that

> [i]n many cases it is necessary for clients to pool information in order to obtain effective representation.  So, to encourage information-pooling, the common inter-

---

[11]   The OIC's suggestion that he may second-guess the official position of the United States Government on the scope of the attorney-client privilege, as enunciated by the Department of Justice, is in considerable tension with the statute under which the OIC operates.  The statute permits the OIC to deviate from the Department's view only when it is "not possible" for him to comply.  28 U.S.C. § 594(f).

[12]   As already noted, the Supreme Court's Proposed Rules of Evidence represent highly persuasive statements of the common law of privilege the courts should apply under Fed. R. Evid. 501.  *See supra* note 9.

est rule treats all involved attorneys and clients as a single attorney-client unit, at least insofar as a common interest is pursued.

2 STEPHEN A. SALTZBURG ET AL., FEDERAL RULES OF EVIDENCE MANUAL 599 (6th ed. 1994) (footnotes omitted); *accord In re Sealed Case*, 29 F.3d 715, 719 (D.C. Cir. 1994) ("The common interest privilege protects communications between a lawyer and two or more clients regarding a matter of common interest."). Besides preserving the privilege for attorney-client communications made among attorneys for clients with a common interest, the privilege also allows the attorneys to share work product without waiver of the protection the work product rule provides. *See United States v. AT&T*, 642 F.2d 1285, 1299–1301 (D.C. Cir. 1980). The common interest rule applies with equal force in the governmental context as outside. *See id.* at 1300 ("The government has the same entitlement as any other party to assistance from those sharing common interests, whatever their motives").

In this case, attorneys representing the White House and the President's private counsel were pursuing a common interest in responding to the allegations made against a sitting President involving his conduct in the White House. (*See* Lindsey Decl. ¶¶ 12–13; Ruff Decl. ¶ 30). As discussed herein, the OIC's investigation, although nominally directed at the President's personal conduct, has had unavoidable effects on the functioning of the Presidency and the institutions of government. The indisputable need for White House attorneys to confer with the President's private counsel on matters of common interest shields their discussions from compelled disclosure.

### E.   Certain of the Materials Sought are Protected from Disclosure Because they Constitute Attorney Work Product

The OIC's Motion to Compel also intrudes upon matters protected from disclosure by the work product doctrine. *See Hickman v. Taylor*, 329 U.S. 495 (1947). The attorney work-product rule, like the attorney-client privilege, has received official Congressional recognition in the governmental context. *See* 5 U.S.C. § 552(b)(5); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 154 (1975); *FTC v. Grolier, Inc.*, 462 U.S. 19 (1983). The Department of Justice has also rec-

ognized the existence of the governmental attorney work product doctrine in circumstances that parallel the OIC's Motions here. *See* DOJ Brief, *supra*, at 18–19.

Among the subjects about which the OIC seeks to compel testimony are attorneys' recollections of their interviews with witnesses who testified before the grand jury. (*See* Lindsey Decl. ¶ 13). Because the OIC has sought to compel government attorneys to disclose the content of witness interviews, the higher standard of protection for attorney opinion work product applies. *See Upjohn*, 449 U.S. at 401 (attorney opinion work product, as distinct from "ordinary" work product, is "entitled to special protection").

## II.   THE OIC SEEKS TO COMPEL COMMUNICATIONS PROTECTED UNDER THE PRESIDENTIAL COMMUNICATIONS PRIVILEGE

The OIC has taken a simplistic and absolutist position in its motions to compel:  it argues that the presidential communications privilege is inapplicable to any communications that relate to the President's "private" conduct. That contention is flatly wrong. Any conduct by the individual holding the Office of the President, whether it is characterized as private or official, can have substantial impact on a President's official duties. The White House has asserted executive privilege only over those communications that meet that test. For example, the Supreme Court, in *United States v. Nixon*, 418 U.S. 683 (1974), held that the conversations at issue in that case—about a break-in at the Democratic National Committee headquarters, although certainly not about an official function of the President—were presumptively privileged. *See also Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974). Thus, the OIC is urging on this Court a position that the Supreme Court and the D.C. Circuit have long ago rejected.

### A.   Legal Framework for Evaluating a Claim of Privilege for Presidential Communications

The case law establishes a clear framework for evaluating a claim that the presidential communications privilege protects a conversation or document from compelled disclosure. The

OIC's Motions do not even acknowledge the existence of this framework.  Accordingly, we will begin by laying out the key principles.

### 1.    The Presumption of Privilege

"Presidential conversations are 'presumptively privileged,' even from the limited intrusion represented by *in camera* examination of the conversations by a court." *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 730 (D.C. Cir. 1974) (quoting *Nixon v. Sirica*, 487 F.2d 700, 717–18 (D.C. Cir. 1973), *quoted with approval in United States v. Nixon*, 418 U.S. 683, 708 (1974)) (footnote omitted); *see also In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997).  Grounded in constitutional separation of powers concerns, the presidential communications privilege is fully applicable in grand jury proceedings and bars compelled disclosure of the privileged matter.  *Sealed Case*, 121 F.3d at 756.  Because presidential communications are presumed to be privileged until the privilege is overcome by an extraordinary showing, the OIC is wrong in claiming that the White House has any "burden" to carry.[13] Rather, the burden is squarely on the OIC to make the showing necessary to overcome the presumption of privilege.

As the Supreme Court has recognized, this long-standing privilege[14] ensures that the President receives "candid, objective, and even blunt or harsh" advice from the inner circle of aides on whom he must, of necessity, rely every day:

> The expectation of a President to the confidentiality of his conversations and correspondence, like the claim of confidentiality of judicial deliberations, for example, has all the values to which we accord deference for the privacy of all citizens

---

[13]  *See, e.g.*, OIC's Brief in Support of Motion to Compel Bruce R. Lindsey to Testify ("OIC Lindsey Br.") at 2 n.4 (citing *Bartholdi Cable Co. v. FCC*, 114 F.3d 274, 280 (D.C. Cir. 1997), a case that did not involve the presidential communications privilege).  All three of the OIC's supporting briefs cite this same irrelevant case.

[14]  *See, e.g.*, *Sealed Case*, 121 F.3d at 739 n.9 (first assertion of a presidential communications privilege came during the Washington Administration).  Virtually every Administration since Washington's has invoked the executive privilege in one form or another.  *See generally* MARK J. ROZELL, EXECUTIVE PRIVILEGE 32–48, 83–140 (1994) (summarizing invocations of executive privilege by, *inter alia*, Presidents George Washington, John Adams, Thomas Jefferson, James Madison, Andrew Jackson, Abraham Lincoln, Calvin Coolidge, Herbert Hoover, Franklin D. Roosevelt, Harry S Truman, Dwight D. Eisenhower, John F. Kennedy, Lyndon B. Johnson, Gerald R. Ford, Jimmy Carter, Ronald Reagan, and George Bush).

and, added to those values, is the necessity for protection of the ***public interest in candid, objective, and event blunt or harsh opinions in Presidential decision-making.*** A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately.

*United States v. Nixon*, 418 U.S. at 708 (emphasis added).

One cannot overstate the intolerable threat that an unduly constrictive reading of the privilege poses to the President's ability to get frank and candid advice from his advisors. Indeed, many years before the Nixon Presidency rendered discussions of the privilege controversial, President Eisenhower underscored the crucial role the privilege plays in promoting effective governance, going so far as to remark that, if confidential presidential communications were "subject to investigation by anybody," it could "wreck the Government."[15] Scholarly authority confirms the privilege's salutary role in encouraging candid advice to the President:

> The president's constitutional duties necessitate his being able to consult with advisers, without fear of public disclosure of their advice. If officers of the executive branch believed that their confidential advice could eventually be disclosed, the quality of that advice would suffer serious damage. Indeed, it would be difficult for advisers to be completely honest and frank in their discussions if their every word might someday be disclosed to partisan opponents or the public.

MARK J. ROZELL, EXECUTIVE PRIVILEGE 53–54 (1994).

Affording appropriate deference to a co-equal branch of the government under separation of powers principles, reviewing courts always have recognized that, when the presidential communications privilege has been invoked, a presumption of privilege attaches. *See Sealed Case,*

---

[15]   President Eisenhower stated:

> But when it comes to the conversations that take place between any responsible official and his advisers . . . expressing personal opinions on the most confidential basis, those are not subject to investigation by anybody; and if they are, will wreck the Government. There is no business that could be run if there would be exposed every single thought that an adviser might have, because in the process of reaching an agreed position, there are many, many conflicting opinions to be brought together. And if any commander is going to get the free, unprejudiced opinions of his subordinates, he had better protect what they have to say to him on a confidential basis.

*The President's News Conference of July 6, 1955*, 1955 PUBLIC PAPERS OF THE PRESIDENTS 665, 674, *quoted in* Archibald Cox, *Executive Privilege*, 122 U. PA. L. REV. 1383, 1386 (1974). The President continued: "It is exactly, as I see it, like a lawyer and his client or any other confidential thing of that character." *Id.*, 1955 PUBLIC PAPERS OF THE PRESIDENTS at 674.

121 F.3d at 744 ("If the President does so [invokes the privilege], the documents become presumptively privileged."); *Senate Select Committee*, 498 F.2d at 730; *accord United States v. Nixon*, 418 U.S. at 713 ("Upon receiving a claim of privilege from the Chief Executive, it became the further duty of the district court to treat the subpoenaed material as presumptively privileged[.]").  This Court should reject the OIC's invitation to become the first court ever to adopt a contrary rule.

2.    <strong>Communications to Which the Privilege Applies</strong>

The "presidential communications" privilege covers a significantly broader range of communications than its name suggests.  In *Sealed Case*, the fullest recent explication of the privilege, the Court of Appeals for this Circuit squarely rejected the notion that the privilege attaches only to communications directly to or from the President.  *See generally Sealed Case*, 121 F.3d at 746–53.  Instead, the Court applied a more discerning analysis, which recognized the privilege's "root[s] in the constitutional separation of powers principles and the President's unique constitutional role," *id.* at 745—a role the President cannot perform without the close cooperation of an inner circle of advisors and assistants.  Thus, to effect the purposes of the privilege, the Court recognized that it must protect not only the President's own communications, but also communications to and from the persons on whom the President directly relies for decisionmaking assistance:

> [C]ommunications made by presidential advisers in the course of preparing advice for the President come under the presidential communications privilege, even when these communications are not made directly to the President.  Given the need to provide sufficient elbow room for advisers to obtain information from all knowledgeable sources, the privilege must apply both to communications which these advisers solicited and received from others as well as those they authored themselves.  The privilege must also extend to communications authored or received in response to a solicitation by members of a presidential adviser's staff, since in many instances advisers must rely on their staff to investigate an issue and formulate the advice to be given to the President.

*Id.* at 751–52.

The privilege also covers individuals outside the President's inner circle, and even out-side the White House, if those individuals relate "communications authored or solicited and received by members of an immediate White House adviser's staff[.]" *Id.* at 752; *see also id.* at 758 (although legal extern "did not exercise broad and significant responsibility," all the extern's relevant communications "were clearly created at the request of" those who did, and were there-fore privileged); *id.* (documents for which no author was listed had plainly been solicited by individuals with key responsibility for advising the President, and were therefore privileged).

While scrupulously protecting the public interest in the effective operation of the highest levels of the Executive Branch, *Sealed Case* fully recognized and accommodated the public interest in ascertaining the truth in grand jury proceedings. Thus, the OIC is wrong to assert (OIC Lindsey Br. at 5–6) that the mere potential relevance of evidence is sufficient to overcome the protection of the privilege in a grand jury proceeding. The grand jury is not, as *Sealed Case* recognized, free to disregard established testimonial privileges. The presidential communica-tions privilege in particular advances a substantial public interest on which the grand jury may not infringe:

> [W]e are ever mindful of the dangers involved in cloaking governmental opera-tions in secrecy and placing obstacles in the path of the grand jury in its investi-gatory mission. ***There is a powerful counterweight to these concerns, however, namely the public and constitutional interest in preserving the efficacy and quality of presidential decisionmaking.***

*Sealed Case*, 121 F.3d at 762 (emphasis added).

### 3.       The Showing Required to Overcome the Presumption

The presumptive privilege, once invoked by the President, is not easily overcome. "[A] party seeking to overcome the presidential privilege seemingly must always provide a focused demonstration of need[.]" *Sealed Case*, 121 F.3d at 746. "Efforts should first be made to deter-mine whether sufficient evidence can be obtained elsewhere, and the subpoena's proponent should be prepared to detail these efforts and explain why evidence covered by the presidential privilege is still needed." *Id.* at 755. The "need" inquiry "turn[s], ***not on the nature of the***

*presidential conduct that the subpoenaed material might reveal,* but, instead, on the nature and appropriateness of the function in the performance of which the material was sought, and the degree to which the material was necessary to its fulfillment." *Senate Select Committee,* 498 F.2d at 731 (emphasis added); *accord Sealed Case,* 121 F.3d at 746.  That this is a high hurdle indeed is shown by *Senate Select Committee*'s observation that the "showing must depend solely on whether the subpoenaed evidence is demonstrably critical to the responsible fulfillment" of the function of the entity seeking to compel production.[16]  *Senate Select Committee,* 498 F.2d at 731.  A mere showing of "an asserted power to investigate and inform," *id.* at 732, does not suffice.  The Court's holding that "the Select Committee has failed to make the requisite show-ing," *id.* at 731, reinforces that the standard of need requires a very strong substantive showing that a court must scrutinize with the greatest care.

Moreover, the Court must assess the sufficiency of the showing of need without reference to the privileged communications themselves.  *Sealed Case* makes very plain the steps involved in evaluating an attempt to overcome the privilege.  Once the presumption of privilege attaches, the party seeking the information becomes obliged to make a "focused demonstration of need." *Sealed Case,* 121 F.3d at 746.  Only after the party opposing the claim of privilege makes a sufficient showing does the President become obliged to cede control of the privileged materials. The "focused demonstration of need" does not itself require the President to turn over the infor-mation to the party seeking it, however, but only to submit it under seal to the district court for *in camera* review.  *Id.* at 759–60.  The district court reviews the items and extracts the specific relevant portions as to which the privilege has been overcome, and then those extracts and no other parts of the privileged communications may be provided to the party opposing the claim of privilege.

---

[16]  Although *Sealed Case,* like the present case but unlike *Senate Select Committee,* involved the Executive Branch's opposition to compulsory judicial process, rather than a legislative inquiry (*see Sealed Case,* 121 F.3d at 753), *Sealed Case* repeatedly employed (and necessarily adopted) *Senate Select Committee*'s explication of the need requirement, suggesting that, at least as to this element, the standards for evaluating any given assertion of the presidential communications privilege are identical no matter which branch of government is seeking to overcome the privilege.

*Sealed Case* also makes clear that this Court must scrutinize communications individually to determine whether the OIC has met this standard. The blanket ruling the OIC seeks, declaring all the communications at issue here to be outside the scope of the privilege, is precisely what the Court of Appeals forbade in *Sealed Case*. *See* 121 F.3d at 740 (criticizing the District Court for issuing "a blanket ruling, with no individualized discussion of the documents"); *see also id.* ("the court also failed to provide any explanation of its legal reasoning").

The high standard of need is intended to prevent precisely the misuse of the grand jury process in which the OIC has engaged here. It effectuates the principle that "presidential communications should not be treated as just another source of information"[17] by requiring the OIC first to develop sufficient evidence from other sources to substantiate its showing of need, before intruding on the President's communications with his advisors:

> Nor do we believe the *Nixon/Sirica* need standard imposes too heavy a burden on grand jury investigation. In practice, the primary effect of this standard will be to ***require a grand jury to delay subpoenaing evidence covered by presidential privilege*** until it has assured itself that the evidence sought from the President or his advisers is both important to its investigation and practically unavailable elsewhere. As was true in *Sirica*, a grand jury will often be able to specify its need for withheld evidence in reasonable detail based on information obtained from other sources.

*Sealed Case*, 121 F.3d at 756–57 (emphasis added); *see also id.* at 761 ("it is hard to conclude that the OIC issued its subpoena to the White House as a last resort."). By turning to privileged presidential communications as its first resort, the OIC has turned the *Nixon/Sirica/Sealed Case* paradigm on its head and sparked a premature confrontation on an inadequate record.

### B.  The Conversations at Issue Here are Privileged

As shown below, application of the established analytical framework to the communications at issue here shows unmistakably that the communications are privileged. In arguing the contrary, the OIC contends that this case involves allegations about the President that relate to private activity. This argument, however, fails both legally and factually. As a legal matter, the

---

[17]  *Sealed Case*, 121 F.3d at 755.

OIC's argument misreads the Supreme Court's decisions both in *Nixon* and in *Clinton v. Jones*, as well as authorities from the D.C. Circuit, involving the distinctions between official and personal conduct relevant to the assertion of privilege. And as a factual matter, the OIC ignores that, from the beginning, the Lewinsky matter has unavoidably involved the functioning of the President in his official capacities as head of government and head of state.

### 1.     The Communications at Issue Involved Official Presidential Decisions

Allegations about "private" conduct by a sitting President can and do have a substantial impact on his official duties and activities. The OIC's argument ignores the many factual respects in which the instant litigation unavoidably intersects with the President's performance of his constitutional duties.[18]

Contrary to the OIC's assertions, not one of the witnesses who have testified before the grand jury, including the three whose testimony the OIC now seeks to compel, have ever invoked a blanket assertion of privilege to refuse to answer "*any* questions concerning conversations about Monica Lewinsky that occurred among White House staff." (OIC Lindsey Br. 1, *see also* OIC Hernreich Br. 2;[19] OIC Blumenthal Br. 2). Mr. Lindsey, for example, has appeared three times before the grand jury and has testified in great detail, to the extent of his personal knowledge, about discussions inside and outside the White House relating to the Lewinsky matter. (*See* Lindsey Decl. ¶¶ 9, 14, 15, 16(a)–(i), 17). The White House has invoked the privilege only as to communications designed to aid the President in the execution of his official duties. (*See id.* ¶ 17).

---

[18]   Even the President's political opponents have recognized the impact of the OIC's investigation on the functioning of the Presidency as an institution. *See* David Rogers, *Lott Says Clinton-Starr Standoff Hurts Government and Urges Both Sides to Act*, Wall St. J., Mar. 10, 1998, at A24 (quoting Senate Majority Leader Trent Lott (R-Miss.) as saying the Lewinsky matter is "getting to be a distraction in Washington and affecting the president and perhaps even the Congress, in doing the people's business[.]"). *See also id.* ("'I don't think it's good for the presidency. I don't think it's good for the country,' he [Lott] said in a later interview."). (*See also* Ruff Decl. ¶ 24).

[19]   Consistent with the White House's proposal of March 4, 1998, submitted as part of the White House's performance of the constitutionally mandated accommodation process recognized by *Sealed Case*, the White House withdraws the assertion of executive privilege over factual matters, including communications with the President, on behalf of non-attorney advisors such as Ms. Hernreich.

What the OIC apparently fails to understand, or is unwilling to admit, is that this case has in fact had a demonstrable effect on the operations of the White House as an institution. Several examples will illustrate the profound impact the Lewinsky matter has had on the functioning of the Presidency. The White House offers these examples solely for illustrative purposes. Nothing in *Nixon* or *Sealed Case* suggests that the question whether a particular issue calls for direct involvement and decisionmaking by the President is amenable to judicial review. Similarly, the cases do not suggest that the President's determination to seek advice on a particular subject, or his choice of sources of advice on which to rely, are open to question after the fact by the OIC. Thus, although the presidential communications privilege provides the President with a "qualified" protection that a court may overcome on a sufficiently strong showing of need by the opposing party, *Sealed Case*, 121 F.3d at 745, the predicate issues—whether a given subject requires the President's attention, whether the President should seek advice on the matter, and from whom—are for the President and his advisors alone. The White House does not concede the contrary by discussing the following examples of presidential decisionmaking.

These examples make clear that the OIC's effort to eliminate all conversations relating to the Lewinsky matter from the protection of the presidential communications privilege is glaringly misdirected.

### a. Discussions Relating to the President's State of the Union Address

The Constitution requires the President periodically to report to Congress on the State of the Union. U.S. CONST. Art. II, § 3, cl. 1. Advisors made certain of the communications that the OIC seeks here in the course of advising the President on the performance of that duty, (*see* Blumenthal Decl. ¶¶ 5, 13), and those communications are squarely covered by the presidential communications privileges. *Cf. Sealed Case*, 121 F.3d at 752 (communications presumptively privileged because they "were generated in the course of advising the President in the exercise of . . . a quintessential and nondelegable Presidential power.").

The President addressed the nation on January 27, 1998 and did not discuss the Lewinsky matter. *See Address Before a Joint Session of the Congress on the State of the Union*, 34 WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS 129 (Jan. 27, 1998). Leading up to the address, though, conversations took place within the White House about how the President should handle the matter. Senior White House advisors also advised the President how to respond to the many questions reporters asked him concerning how he would treat the allegations in the State of the Union speech.[20] (*See* Lindsey Decl. ¶ 11; Ruff Decl. ¶ 23; Declaration of Sidney Blumenthal ("Blumenthal Decl.") ¶¶ 5, 13–15). Thus do allegations related to ostensibly "private" conduct have a substantial impact on the President's constitutional duties. These discussions occurred in the course of advising the President on his discharge of a core constitutional obligation, and are presumptively privileged from disclosure.

### b.    Matters of Foreign Policy and Military Affairs

In the weeks since the allegations involving the President surfaced, it has become abundantly clear that the OIC's current investigation has consequences even for the nation's foreign policy and military affairs, and the President's roles as head of state and Commander-in-Chief— core Executive Branch functions which have long merited the greatest deference from the other branches of government. *See* U.S. CONST. Art. II, § 2 cl. 1, § 3 cl. 3. Reporters have questioned visiting foreign heads of state about the OIC's investigation.[21] Other foreign government offi-

---

[20]    *See, e.g., Excerpt of a Telephone Interview With Morton Kondrake and Ed Henry of Roll Call*, 34 WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS 115 (Jan. 21, 1998); *Interview With Mara Liasson and Robert Siegel of National Public Radio*, 34 WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS 116, 117 (Jan. 21, 1998).

[21]    *See The President's News Conference With Prime Minister Blair*, 34 WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS 213–22 (Feb. 9, 1998); *see also* John M. Broder, *Clinton Refuses to Discuss Independent Counsel's Request That He Testify Before Grand Jury*, N.Y. TIMES, Mar. 12, 1998, at A24 (reporters ask questions about the Lewinsky matter during the President's public appearance with United Nations Secretary General Kofi Annan, prompting Secretary General Annan to complain, "I wish you would concentrate on my issues. I don't come every day.").

The early days of the Lewinsky matter also coincided with official state visits by Israeli Prime Minister Benjamin Netanyahu and Palestinian Authority Chairman Yasser Arafat. The President, in one of his first public interviews after the OIC began probing the Lewinsky-related allegations, mentioned the extraordinary steps he had endeavored to take to ensure that the burgeoning controversy not distract him from the proper conduct of the nation's foreign policy. *See Interview With Jim Lehrer of the PBS "News Hour"*, 34 WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS 104–05, 106–07, 114 (Jan. 21, 1998).

cials have expressed their concern that the investigation must not be allowed to detract from the United States' ongoing and crucial role as peacemaker.[22] Some of the conversations over which the White House has invoked the presidential communications privilege involved the formulation of advice for the President as to the appropriate White House response when foreign officials inquired about, or were questioned about, the Lewinsky matter. (*See* Blumenthal Decl. ¶¶ 10–11, 13–15).

What is more, the current investigation has unfolded during a turbulent period in the nation's international relations, when the President and his advisors have been formulating a response to continued violations by Iraq of United Nations Security Council resolutions on weapons inspection adopted in the wake of the 1991 Persian Gulf War. Although the immediate threat of military conflict appears to have diminished somewhat at this moment, certain conversations at issue here occurred at a time when military confrontation appeared highly likely and the President's need to concentrate on the nation's military and foreign affairs was at its peak. Deliberations within the White House about how to keep the controversy related to the Lewinsky matter from hampering the President's conduct of the nation's military and foreign policy formed a part of the discussions over which the White House has invoked the presidential communications privilege. (*See* Ruff Decl. ¶ 27; Blumenthal Decl. ¶ 15). For the foregoing reasons, the conversations at issue here plainly fall under the presumptive privilege established in *Nixon* and *Sealed Case*.

**c.    Discussions of Possible Referral by the OIC to the House Judiciary Committee**

As the discussion of the facts surrounding the expansion of the OIC's inquiry in mid-January 1998 makes clear, the immediate effect of the new allegations of possible obstruction of justice led commentators and reporters to discuss the issue of impeachment and, therefore,

---

[22]    *See, e.g., supra* note 21; Alessandra Staley, *American Puritanism or Zionist Plot? The World Weighs In*, N.Y. TIMES, Jan. 24, 1998, at A9 (discussing, *inter alia*, the effect of the Lewinsky-related allegations on the Middle East peace process); *Remarks Prior to Discussions With Chairman Yasser Arafat of the Palestinian Authority and an Exchange With Reporters*, 34 WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS 123, 124 (Jan. 22, 1998) (reporters question the President about the Lewinsky matter at a press conference with Chairman Arafat).

placed it on the discussion agenda of senior White House advisors.[23]  (*See* Lindsey Decl. ¶ 11).
The White House received many inquiries from the press on this possibility.  (*See* Ruff Decl.
¶ 22).  Indeed, the President himself has been questioned by reporters on the subject.[24]  Senior
advisors to the President, including attorneys in the White House Counsel's office, have a duty to
obtain factual information relevant to the investigation to advise the President concerning this
issue.  (*See* Ruff Decl. ¶ 22).

Impeachment is the one remedy expressly provided in the Constitution (Art. II, § 4) that
can be directed against the President, and it is fatuous for the OIC to contend that discussions of
the prospect between the President and his core advisors could, in any sense, be considered
"personal" or "unofficial."  In part because of the formal responsibilities of the Counsel to the
President in the event of impeachment proceedings, "even the mere speculation of such pro-
ceedings raises serious issues that a President and his advisors must address."  (Ruff Decl. ¶ 19).
Because of the constitutional concerns directly implicated by an investigation that threatens
possible impeachment proceedings against the President, conversations on this subject must be
deemed presumptively privileged.

> **d.  Allocation of the President's Time Between Public
> Responsibilities and Defending Himself in the *Jones*
> Litigation and the Lewinsky Matter**

The expansion of the OIC's jurisdiction in mid-January 1998 immediately returned to the
forefront of the White House's agenda an issue that had been lingering since the Supreme
Court's decision in *Clinton v. Jones* the preceding summer.  The Court's decision declining to
stay the *Jones* proceedings during the President's term of office immediately raised the issue of

---

[23]   The possibility of proceedings in the House Judiciary Committee had, of course, been discussed within the
White House even before the Lewinsky-related allegations surfaced.  *See* H. Res. 304, 105th Cong., 1st Sess. (Nov.
5, 1997).  (*See also* Ruff Decl. ¶¶ 19–21).

[24]   *See Excerpt of a Telephone Interview With Morton Kondrake and Ed Henry of Roll Call*, 34 WEEKLY COMPILA-
TION OF PRESIDENTIAL DOCUMENTS 115 (Jan. 21, 1998).

how the President should defend himself in the litigation without, in the Court's words, allowing the case to "engulf the Presidency." *Jones*, 117 S. Ct. at 1648.

The Court's decision allowing the case to proceed necessarily required the President to devote part of his schedule to the conduct of his defense. Questions as to how the President allocates his time, however, are imbued with a public, official nature, for every moment the President must spend defending himself in private litigation is a moment in which he is unavailable to execute the duties of the office to which he was elected. Thus, the question of how to minimize the *Jones* litigation's interference with the President's performance of his official duties was an important subject of discussion among the President's senior advisors. (*See* Lindsey Decl. ¶ 8).

The U.S. Department of Justice's brief as *amicus curiae* in *Jones*, for example, succinctly described the public significance of the issue:

> As a practical matter, the countless issues of domestic and foreign policy that demand the President's attention fully occupy, and indeed outstrip, the capacity of the President to respond. . . . *As a result, the Presidency's most precious commodity is time, and one of the most vexing problems for the President and his staff is how to divide that time among the disparate issues that call for his attention.*

*Clinton v. Jones*, 117 S. Ct. 1636 (1997), Brief for the United States as *Amicus Curiae* in Support of Petitioner at 10–11 (emphasis added); *accord Jones*, 117 S. Ct. at 1646 (recognizing demands on a sitting President's schedule). Notably, presiding Judge Wright permitted the Counsel to the President to attend the President's deposition in the *Jones* case, a recognition that the case has important consequences for the nation and for the institution of the Presidency, not merely for the individual who currently holds that office.

Many of the communications the OIC seeks to compel relate to the President's decisions about strategy regarding how to prevent the *Jones* litigation and the Lewinsky investigation from "engulf[ing] the Presidency." (*See* Lindsey Decl. ¶¶ 9–11). The demands of discovery and the forthcoming trial have required the President to, in some cases, delegate to subordinates within the White House the task of attending to scheduling matters not requiring the President's per-

sonal attention.  Before making each of these decisions, the President gathered recommendations and advice from his aides on how best to meet the scheduling demands of the *Jones* litigation without detracting from the execution of the duties of his office.

### e.     Ongoing Strategy Discussions Relating to the OIC's Investigation

When an issue requiring a rapid presidential decision arises, the President's need for advice and recommendations is correspondingly accelerated.  To perform their advisory function in such a context, it is crucial that the President's advisors remain abreast of breaking developments as they occur, rather than "reinventing the wheel" every time the President solicits their opinions.  Presidential advisors have an on-going duty to gather the facts necessary to render sound advice on short notice when so requested by the President.  To that end, discussions of strategic and policy matters are a staple of every White House advisor's daily routine.  (*See* Ruff Decl. ¶¶ 29–30).

The incursion of the OIC's investigation into the daily operations of the White House is no exception to this principle.  Many of the conversations the OIC seeks to compel involved discussions among senior presidential advisors concerning how the White House should respond to the OIC's investigation, what effect the investigation would have on presidential scheduling (including prearranged travel abroad by the President on diplomatic matters), what effect the investigation would have on the formulation and announcement of new policy initiatives, dealings with Congress, and the like.  (*See* Lindsey Decl. ¶ 12; Ruff Decl. ¶¶ 29–30).  Because these discussions formed an on-going part of the advisors' function to counsel the President on decisions he must make, they are presumptively privileged.

**f.    Discussions as to Whether to Assert the Presidential Communications Privilege**

Irrespective of whether the invocation of the privilege may be communicated to a Court through one of the President's intermediaries,[25] the decision whether to claim the privilege is necessarily a matter that falls squarely within the execution of the President's official duties.

Some of the conversations the OIC seeks involved discussions among the President's closest advisors about whether the President should claim a privilege, or refrain from doing so. Such discussions have occurred in the White House virtually every day since the Lewinsky-related allegations surfaced.  (*See generally* Lindsey Decl. ¶ 11; Ruff Decl. ¶¶ 26–28).  The need to balance the twin aims of appropriate disclosure with the institutional need to preserve candid and open communication among advisors presented questions of the most exacting subtlety.  The inevitable risk that an invocation of the privilege, no matter how strongly justified under the law, would prompt unfavorable public commentary also factored into advisors' candid, even fractious, discussions of what advice to give the President.  Because all these discussions occurred while advising the President in connection with a decision only he could make in his official capacity, they are presumptively privileged from disclosure.

**2.    The OIC's Argument Misconstrues the Relevant Authorities**

Besides being inconsistent with the facts, the OIC's argument that the presidential communications privilege is subject to an implicit exception for "personal" or "unofficial" presidential conduct is at odds with precedent from both the Supreme Court and the Court of Appeals for this Circuit.

The Court of Appeals' opinion in *Senate Select Committee* holds squarely against the argument the OIC makes here.  In *Senate Select Committee*, an investigating arm of the Congress attempted to compel the President to produce "taped recordings of five conversations . . . 'between President Nixon and John Wesley Dean, III, discussing alleged criminal acts occurring

---

25   *See Sealed Case*, 121 F.3d at 744–45 n.16 (the cases do not establish whether the privilege must be claimed by the President personally).

in connection with the Presidential election of 1972.' " *Senate Select Committee*, 498 F.2d at 727. These conversations related to acts far outside the boundaries of the President's official duties, namely, the ransacking of the DNC's Watergate offices. Under the OIC's theory here, these conversations would not have been presumptively privileged.

The D.C. Circuit held precisely to the contrary. *See id.* at 730. Moreover, the Court found the Senate Select Committee's showing of need for the tapes inadequate, and denied the Senate's motion to compel. *Id.* at 731 ("we find that the Select Committee has failed to make the requisite showing" to overcome the presumption).

The OIC's argument is also at odds with the Supreme Court's decision in *United States v. Nixon*. The presidential communications at issue in that case involved private conduct by other individuals, but nonetheless were held presumptively privileged by the Supreme Court. *See Nixon*, 418 U.S. at 713–14. Indeed, nothing in *Nixon* suggests that the conversations at issue were characterized by an overarching public or official purpose, as distinct from discussions pertaining to the potential individual liability of the President (who had, after all, been named an unindicted co-conspirator by the grand jury, and whose subordinates had already been convicted of Watergate-related crimes).[26] Thus, the OIC's legal theory has been rejected by both the D.C. Circuit and the Supreme Court.[27]

The contents of the presidential conversations the Supreme Court held presumptively privileged in *Nixon* indicate that the OIC cannot circumvent the privilege merely by claiming that its sole interest is in the President's actions in his personal, rather than official, capacity. For

---

[26]  President Nixon did not contend that any of the subpoenaed conversations revealed diplomatic or military secrets. *See Nixon*, 418 U.S. at 706, 710. In holding that the conversations were, nevertheless, presumptively privileged (*id.* at 713–14), the Court obviously rejected any notion that the presidential communications privilege is limited to communications implicating foreign policy or national security. *Accord Sealed Case*, 121 F.3d at 757–58 (presidential communications privilege protects internal White House discussions of investigation of Secretary of Agriculture, which did not implicate military or diplomatic concerns). The OIC's suggestion that the privilege cannot come into play here because no "national security or diplomatic secrets" are involved (OIC Lindsey Br. at 4) ignores *all* the relevant precedent.

[27]  The Court in *Nixon* ultimately held that, in the unique circumstances of that case, the Special Prosecutor had made a sufficient showing to support turning over the subpoenaed materials for *in camera* review by the district court. *See Nixon*, 418 U.S. at 713–14. It did so only after finding the materials presumptively privileged, however.

example, some of the conversations that the Supreme Court held presumptively privileged were three discussions between President Nixon and H.R. Haldeman on June 23, 1972. *See Statement Announcing Availability of Additional Transcripts of Presidential Tape Recordings*, 1974 PUBLIC PAPERS OF THE PRESIDENTS 621. These conversations involved President Nixon's attempt to derail the FBI's investigation of the Watergate break-in by falsely alleging a foreign connection over which the FBI had no authority. By contrast, the conversations over which the President has asserted the privilege here are plainly related to his legitimate official functions.

Nor does *Clinton v. Jones* erase the presumption of privilege that attaches to presidential communications under *Nixon* and *Sealed Case*. The OIC suggests that the Supreme Court's characterization of the *Jones* case as "unrelated to any of [the President's] official duties," 117 S. Ct. at 1640, forecloses any application of the presumptive privilege. The Court's holding, however, is in no way inconsistent with the presumptive privilege recognized in *Nixon* and *Sealed Case*. To the contrary, the Court instructed that great deference was owed to the "unique position in the constitutional scheme" the President holds. 117 S. Ct. at 1646 (internal quotations omitted). Although *Clinton v. Jones* held that the Constitution did not mandate a stay of civil proceedings against a sitting President during his term of office, the Court never held or suggested that presidential communications relating to that litigation during the President's term of office were entitled to any less protection than were presidential communications on other subjects. Indeed, *Jones* nowhere suggested that the interests the Court in *Nixon* recognized to underlie the rule of presumptive privilege—the President's need to obtain candid and objective advice and to consider all alternatives in formulating decisions (*see Nixon*, 418 U.S. at 708)—

carry any less force in the context of the public ramifications of civil litigation about personal matters.[28]

### C.    The OIC Has Made No Showing, Least of All the Extraordinary Showing Required, to Overcome the Privilege

As previously discussed, the case law requires the OIC to make a "focused demonstration of need" before presidential communications may even be turned over to the Court for *in camera* review. *See generally supra* at 25–27. But, in another example of its total disregard of the governing analytical framework, the OIC explicitly concedes that it has made no such showing. (OIC Lindsey Br. at 8). Rather, the OIC asks instead that it be allowed to do so at some unspecified future time. Whether the OIC is allowed the second bite at the apple it has attempted to reserve for itself is a question for another day. For present purposes, the point is merely that nothing on the record now suggests that the OIC can make the showing the law requires. In these circumstances, the OIC plainly cannot overcome the presumptive privilege that attaches to the communications at issue here.

---

[28]   It is easy to conceive of other instances in which Presidents' "private" concerns have affected the operation of the Presidency as an institution. The question frequently arises, for example, in correction with Presidents' health problems, such as President Reagan's cancer surgery in 1985 or President Bush's treatment for an irregular heartbeat in 1991. Although the health of the individuals holding the Office of the President is no doubt a "private" concern as the OIC uses the term, these incidents raised a plethora of issues regarding the appropriate governmental response to presidential incapacity, the possibility of invoking the Twenty-Fifth Amendment, and related matters—all of which would unmistakably be considered "official," and therefore protected, notwithstanding that they arose out of a President's private concerns.

## CONCLUSION

Accordingly, for the reasons stated, the OIC's Motions to Compel should be denied.

Respectfully submitted,

Of Counsel:
Charles F.C. Ruff
Counsel to the President
THE WHITE HOUSE
Washington, D.C.  20500
(202) 456-1414

W. Neil Eggleston  (D.C. Bar No. 411957)
Timothy K. Armstrong  (D.C. Bar No. 444200)
HOWREY & SIMON
1299 Pennsylvania Ave., N.W.
Washington, D.C.  20004
(202) 783-0800

Attorneys for The White House

Dated:  March 17, 1998

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Memorandum of the White House in Opposition to OIC's Motions to Compel Bruce R. Lindsey and Sidney Blumenthal to Testify Concerning Conversations Protected by the Attorney-Client, Presidential Communications, and Work Product Privileges were served by hand or Federal Express, this 17th day of March, 1998 upon each of the parties listed below:

Kenneth W. Starr, Esq.                     Independent Counsel
Independent Counsel
Office of the Independent Counsel
1001 Pennsylvania Avenue, N.W.
Suite 490 North
Washington, DC  20004

Charles F. C. Ruff, Esq.                   Counsel to the President
Counsel to the President
The White House
Washington, D.C.  20500

William J. Murphy, Esq.                    Counsel to Bruce R. Lindsey
Murphy & Shaffer
100 Light Street, 9th Floor
Baltimore, Maryland  21202-1019

Mr. William McDaniel                       Counsel to Mr. Sidney Blumenthal
McDaniel & Marsh
118 West Mulberry Street
Baltimore, Maryland  21201

Gerard Treanor, Esq.                       Counsel to Ms. Nancy Hernreich
Venable, Baetjer, Howard & Civiletti
1201 New York Avenue, N.W.
Suite 1000
Washington, D.C.  20005-3917


_____
W. NEIL EGGLESTON